IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

VANGUARD PRODUCTS GROUP, a        10-CV-392-BR
Florida corporation, and
TELEFONIX, INC., an Illinois      OPINION AND ORDER
corporation,                  (UNDER SEAL)

        Plaintiffs,

v.

MERCHANDISING TECHNOLOGIES,
INC., an Oregon corporation,

        Defendant.


TIMOTHY S. DEJONG
JACOB S. GILL
Stoll Stoll Berne Lokting & Shlachter, PC
209 S.W. Oak Street
Suite 500
Portland, OR 97204
(503) 227-1600

       Attorneys for Plaintiffs


1 - OPINION AND ORDER

**MICHAEL J. ESLER**
**JOHN W. STEPHENS**
Esler Stephens & Buckley
700 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 294-3995

       Attorneys for Defendant

**BROWN, Judge.**

       This matter comes before the Court on Plaintiffs' Motion
(#21) for Order to Show Cause Why Defendant Should Not Be Held in
Contempt.  For the following reasons, the Court **GRANTS**
Plaintiffs' Motion and finds Defendant in contempt for violating
the Consent Judgment and Permanent Injunction and the Settlement
Agreement as described herein.


<u>**BACKGROUND**</u>

       Defendant Merchandising Technologies, Inc., builds
interactive retail displays for hand-held consumer electronic
devices.  Defendant's "Freedom" display units included
freestanding bases with retractable electric cables (retractors)
extending from the bases that supplied power and antitheft
security to electronic products.  Defendant purchased Telefonix
retractors from Plaintiff Vanguard Products Group, Telefonix's
exclusive licensee, from early 2000 through some point in 2005.

       On October 5, 2004, the Patent Trade Office (PTO) issued

2 - OPINION AND ORDER

Patent No. 6,799,994 ('994 Patent) to Telefonix, Inc.  The '994

Patent is described as follows:

> A cord management apparatus that provides for the
> convenient management of cords associated with the
> retail display of small electronic devices, such
> as video cameras.  The apparatus comprises a
> multi-conductor device, an adapter for connecting
> the cable to the electronic device, and a base
> member for removably holding the mounting member.
> The base member is fastened to a display rack or
> counter.  A plurality of adaptors are provided so
> that the apparatus may be used with a wide variety
> of devices that may have different connection
> requirements.

On August 1, 2005, Defendant[1] filed an action in this Court

against Plaintiffs, 05-CV-1195-BR (*Vanguard I*), alleging

Plaintiffs violated the Sherman Act, 15 U.S.C. §§ 1 and 2;

seeking a declaration that Defendant was not infringing the '994

Patent; and seeking a declaration that the '994 Patent is

invalid.

On December 30, 2005, Defendant filed a Second Amended

Complaint in *Vanguard I* in which it alleged claims against

Plaintiffs for monopolization through fraud in procuring the '994

Patent in violation of § 2 of the Sherman Act and for tying in

violation of § 2 of the Sherman Act.  Defendant sought damages

and injunctive relief pursuant to § 26 of the Sherman Act or, in

---

[1] The Court uses "Defendant" to refer to Merchandising
Technologies, Inc., who is the defendant in this action and the
plaintiff in *Vanguard I*, and uses "Plaintiffs" to refer to
Vanguard Products Group and Telefonix, Inc., who are the
plaintiffs in this action and the defendants in *Vanguard I*.

the alternative, a declaration that it is not infringing the '994 Patent and that the '994 Patent is invalid and unenforceable. Defendant also brought claims against Plaintiffs for false marking in violation of 35 U.S.C. § 292; prosecution laches with respect to the '994 Patent; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); and violation of Oregon Revised Statute § 646.608.

On February 7, 2007, the Court issued an Opinion and Order in *Vanguard I* in which, among other things, it granted Plaintiffs' Motion to Dismiss the declaratory-judgment patent claims.

On April 19, 2007, Plaintiffs filed a patent-infringement action against Defendant in the United States District Court for the Northern District of Illinois in which Plaintiffs alleged Defendant made, used, and/or offered for sale products that infringed the '994 Patent.

On September 21, 2007, the District Court in Illinois transferred the matter to this Court, Case No. 07-CV-1405-BR (*Vanguard II*)).

On November 16, 2007, this Court signed the parties' Stipulated Dismissal Without Prejudice and dismissed *Vanguard I* without prejudice. Also on that date, Defendant filed a First Amended Answer, Affirmative Defenses, and Counterclaim in *Vanguard II* in which it asserted five Affirmative Defenses:

failure to state a claim, no patent infringement, invalidity and unenforceability of the patent, estoppel, and waiver/laches. Defendant also brought two Counterclaims: false marking and unfair competition in violation of 15 U.S.C. § 1125(a).

On February 28 and 29, 2008, the Court held a *Markman* hearing in *Vanguard II* and construed disputed Claims 1, 7, 8, and 10 during the hearing. On March 24, 2008, the Court issued an Order confirming the Court's claims construction.

On April 7, 2008, the Court issued an Opinion and Order in *Vanguard II* granting Plaintiffs' Motion to Dismiss Defendant's Counterclaim for unfair competition.

The parties subsequently filed Cross-Motions for Summary Judgment in *Vanguard II*. On January 16, 2009, the Court issued an Opinion and Order in which it granted Plaintiffs' Motion for Partial Summary Judgment as to Defendant's Counterclaim for false marking; granted Plaintiffs' Motion for Partial Summary Judgment as to the issue of equitable estoppel; denied Defendant's Motion for Summary Judgment as to the issues of infringement, invalidity, and obviousness; and set the matter for trial on May 18, 2009.

On May 11, 2009, the parties advised the Court that *Vanguard II* had settled. On that same date, the Court signed a Final Judgment by Consent and Permanent Injunction, which provided in pertinent part:

5 - OPINION AND ORDER

> Except for a limited transition period and service
> period provided in the Settlement Agreement, MTI
> . . . from the date of this Final Judgment to and
> including March 16, 2018, are permanently enjoined
> from infringing, contributing to the infringement
> of, or actively inducing the infringement of, any
> of the claims of U.S. Patent No. 6,799,994 by
> (I) making, using, selling, offering for sale, or
> importing into the United States any Infringing
> Products that were the subject of this action or
> any product that is not more than colorably
> different therefrom regardless of the trade name,
> model number, or other product designation under
> which any such product is made, used, sold, or
> offered for sale, or imported into the United
> States (collectively, the "Enjoined Products"); or
> (ii) selling, offering for sale or delivering any
> component parts (Smart Cables, reels or
> retractors, pucks or posts) for use in combination
> with or as part of any Enjoined Product.

Compl., Ex. B at ¶ 6.   The Settlement Agreement provided for a

limited transition and service periods as follows:

> 4.1  To facilitate MTI's transition from the
> Infringing Products to new products, Telefonix and
> Vanguard agree that MTI may utilize the following
> parts associated with Infringing Products: Smart
> Cables, retractors, pucks and posts (collectively
> "Transition and Service Periods"), limited as
> follows:
>
>      a.   For existing customer commitments for
> new store openings and retrofits during the time
> period from May 11, 2009, through December 31,
> 2009 (the "Transition Period"); and
>
>      b.   For service of infringing Products
> during the time period from May 11, 2009 through
> December 31, 2010 (the "Service Period").

Compl., Ex. B at ¶ 4.1.

On April 9, 2010, Plaintiffs filed a Complaint in this

action (*Vanguard III*) for Civil Contempt, Breach of Contract,

Declaratory Judgment, Injunction, and Accounting against
Defendant.

On September 13, 2010, Plaintiffs filed a First Amended
Complaint in *Vanguard III* in which they bring claims for civil
contempt, unjust enrichment, breach of contract, declaratory
judgment, injunction, and accounting on the grounds that
Defendant violated the Consent Judgment and Permanent Injunction
entered in *Vanguard II* when it (1) made sales of enjoined
products for new- store openings and retrofits for which
Defendant did not have any existing customer commitment as of
May 11, 2009 (the date of the Consent Judgment and Permanent
Injunction) and (2) sold and continues to sell component parts to
Wal-Mart for products manufactured by Diam USA that are "not more
than colorably different from the Infringing Products."
Plaintiffs seek (1) profits "realized by MTI on the offending
sales and all sales of service parts to the new stores and all
expenses of the audit"; (2) profits from sales of enjoined
products; (3) a judgment declaring Defendant is prohibited from
selling component parts for Vanguard systems; (4) a judgment
declaring Defendant must make changes to its Smart Cables and
other components to ensure components sold after December 31,
2009, cannot be used with Infringing Products; (5) an injunction
prohibiting Defendant from making further sales of Smart Cables,
retractors, pucks and posts, including Service Parts, components

7 - OPINION AND ORDER

from Diam systems, and components for Vanguard systems, and from selling service parts to stores to which Defendant sold enjoined products after May 11, 2009; (6) an order directing Defendant to provide an accounting to Plaintiffs for all sales after May 11, 2009, of the products at issue including the profits generated therefrom; and (7) attorneys' fees.

On October 4, 2010, Plaintiffs filed a Motion (#21) for Order to Show Cause Why Defendant Should Not Be Held In Contempt in which they move for an order requiring Defendant to show cause why it should not be held in contempt for violation of ¶ 6 of the Consent Judgment and Permanent Injunction and ¶ 4.1 of the Settlement Agreement.

On November 19, 2010, the Court heard oral argument on Plaintiffs' Motion for Order to Show Cause and directed the parties to file supplemental briefing.

On December 20, 2010, the Court held further oral argument and again directed the parties to file further briefing.  The Court took Plaintiffs' Motion under advisement on December 23, 2010.

**DISCUSSION**

Plaintiffs assert the Court should hold Defendant in contempt for violating the Consent Judgment and Permanent

8 - OPINION AND ORDER

Injunction and the Settlement Agreement.[2]

## I.   Contempt Standards

The court has the authority to punish a party for contempt of a court order.  Fed. R. Civ. P 70(e).  At the November 19, 2010, oral argument, the parties agreed this Court should apply the Federal Circuit standards for contempt.  The Federal Circuit has held:

> Before entering a judgment of contempt of an injunction in a patent infringement case, a district court must address two separate questions.  First, the district court must address whether a contempt hearing is an appropriate forum for adjudging whether an allegedly redesigned product is infringing.  *KSM Fastening Sys.*, 776 F.2d at 1532; *Additive Controls*, 154 F.3d at 1349-50.  In doing so, the district court must compare the accused product with the original infringing product.  If there is "more than a colorable difference" between the accused product and the adjudged infringing product such that "substantial open issues with respect to infringement to be tried" exist, contempt proceedings are not appropriate.  *KSM Fastening*, 776 F.2d at 1532.

*Abbott Labs v. TorPharm, Inc.*, 503 F.3d 1372, 1380 (Fed. Cir. 2007).  "The presence of [substantial open issues with respect to infringement to be tried] creates a fair ground for doubt that the decree has been violated."  *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1532 (Fed. Cir. 1985).

---

[2] Although this matter came before the Court on Plaintiffs' Motion for an Order to Show Cause, Plaintiffs made clear in the course of proceedings that they actually sought an order finding Defendant to be in contempt.

Second, if contempt proceedings are appropriate, the district court must address whether the accused product infringes the claims of the asserted patent. *Additive Controls*, 154 F.3d at 1349. To show infringement, the patentee "must prove by clear and convincing evidence that 'the modified device falls within the admitted or adjudicated scope of the claims." *Arbek Mfg*., 55 F.3d at 1569 (quoting *KSM Fastening*, 776 F.2d at 1530).

*Abbott Labs*, 503 F.3d at 1381.

Ultimately "whether infringement should be adjudicated in contempt proceedings, . . . involves, to a large extent, the exercise of judicial discretion. *KSM Fastening Sys.,* 776 F.2d 1522 at 1530.

## II.  Defendant violated the Consent Judgment and Permanent Injunction by selling component parts (Smart Cables) to Wal-Mart for use in combination with or as part of enjoined products.

As noted, the Consent Judgment and Permanent Injunction permanently enjoins Defendant from

contributing to the infringement of, or actively inducing the infringement of, any of the claims of U.S. Patent No. 6,799,994 by . . . (ii) selling, offering for sale or delivering any component parts (Smart Cables, reels or retractors, pucks or posts) for use in combination with or as part of any Enjoined Product.

Compl., Ex. B at ¶ 6. Paragraph 6 defines "Enjoined Products" as

any Infringing Products that were the subject of this action or any product that is not more than colorably different therefrom regardless of the trade name, model number, or other product designation under which any such product is made, used, sold, or offered for sale, or imported into the United States (collectively, the "Enjoined

Products").

*Id*.

Plaintiffs contend Defendant violated the Consent Judgment and Permanent Injunction by contributing to infringement of the '994 Patent when it sold Smart Cables to Wal-Mart for use with Diam products that are not more than colorably different from Defendant's infringing products.

**A.    Contempt proceedings are appropriate on this record.**

As noted, the Federal Circuit has held with respect to contempt proceedings in patent matters that the district court first must address whether a contempt hearing is an appropriate vehicle for adjudging whether a product is infringing and, as a result, whether a party contributed to infringement. *KSM Fastening Sys.*, 776 F.2d at 1532. *See also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1349-50 (Fed. Cir. 1998).  Contempt proceedings are appropriate only if (1) there is not "more than a colorable difference" between the product with which a party allegedly contributes to infringement and the adjudged infringing product, and, therefore, (2) no "substantial open issues with respect to infringement to be tried." *KSM Fastening* Sys., 776 F.2d at 1532.  *See also Abbott Labs*, 503 F.3d at 1380.

Plaintiffs assert contempt proceedings are appropriate here because Plaintiffs have established the Diam products sold

11 - OPINION AND ORDER

to Wal-Mart are not more than colorably different from the products enjoined by the Consent Judgment and Permanent Injunction in *Vanguard II*.  To support their assertion, Plaintiffs rely on a decision of the United States District Court for the Northern District of Illinois in which that court found at summary judgment that the Diam products sold to Wal-Mart for which Defendant supplied Smart Cables infringed all claims of the '994 Patent.  According to Plaintiffs, therefore, Defendant contributed to infringement of the '994 Patent by selling Smart Cables to Wal-Mart for use in the Diam product that was not more than colorably different from Defendant's infringing products.

In their supplemental briefing following the November 19, 2010, oral argument, Plaintiffs also rely on the Declaration of John Hunt in which he opined Diam's products (including Defendant's Smart Cable) "have each of the elements of Claim 1 of the '994 Patent."  Hunt Decl. at ¶ 7.  In addition, Hunt opined "the Diam products and the Infringing Products work in substantially the same manner and accomplish substantially the same result[; they are] functionally equivalent electrically and mechanically."  Hunt Decl. at ¶ 5.  In addition, at the December 20, 2010, oral argument, Defendant conceded for purposes of the Motion for Order to Show Cause that the Diam device (including Defendant's Smart Cable) would infringe on the '994 Patent unless Wal-Mart has an implied license to use the product.

12 - OPINION AND ORDER

The Court concludes on this record that Plaintiffs have established there are not "substantial open issues with respect to infringement to be tried," and, therefore, contempt proceedings are an appropriate forum for Plaintiffs to seek relief.

**B.    Defendant contributed to the infringement of the '994 Patent when it sold Smart Cables to Wal-Mart for use in Diam's products.**

Because the Court has concluded it is appropriate for Plaintiffs to seek relief in contempt proceedings, the Court first must determine whether Defendant violated the Consent Judgment and Permanent Injunction by contributing to the infringement of the '994 Patent when it sold Smart Cables to Wal-Mart for use with the Diam products that infringe the '994 Patent.

Defendant asserts Plaintiffs cannot prove by clear and convincing evidence that Defendant contributed to infringement of the '994 Patent when it sold Smart Cables to Wal-Mart because "enjoined products" under the Consent Judgment and Permanent Injunction refer only to those products manufactured by Defendant. In addition, according to Defendant, even if "enjoined products" include products made by Diam, Wal-Mart had an implied license to use those products, and, therefore, Defendant could not have contributed to infringement of the '994 Patent by Wal-Mart.

13 - OPINION AND ORDER

      **1.   Standard to apply in interpreting the Consent Judgment and Permanent Injunction.**

      Paragraph 18 of the Settlement Agreement[3] provides the "construction, [and] interpretation [of the Agreement] . . . shall be governed by the laws of the State of Oregon."  In addition, the Federal Circuit applies the rules of construction that would be used by the regional circuit court of appeals for the circuit in which the district court is located when construing consent orders.  *Thatcher v. Kohl's Dep't Stores, Inc.*, 397 F.3d 1370, 1373-74 (Fed. Cir. 2005).  In turn, the Ninth Circuit applies the rules of construction of the state in which the district court is located when construing consent orders.  The Court, therefore, applies Oregon rules of construction when interpreting the Consent Judgment and Permanent Injunction and the Settlement Agreement.  *See, e.g., Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1332 (Fed. Cir. 2009).

      Under Oregon law,

> [w]hen . . . interpret[ing] any written instrument, [the court's] objective is to ascertain the meaning that most likely was intended by the parties that entered into it . . . .  [The court] ascertain[s] the meaning most likely intended by the parties by means of a three-step inquiry.  [The court] begin[s] with the text of the disputed

---

[3] The Court specifically incorporated the Settlement Agreement in the May 11, 2009, Consent Judgment and Permanent Injunction.

> provision in the context of the instrument as
> a whole.  In examining the text of the
> disputed provision [the court] determine[s]
> whether that provision is ambiguous, for, if
> the provision according to its terms is
> unambiguous, [the court] enforce[s] the
> provision according to its terms as a matter
> of law.  A contractual provision is ambiguous
> only if it is capable of more than one
> plausible and reasonable interpretation.  If
> the disputed provision is ambiguous, [the
> court] proceed[s] to a second step that
> involves examining extrinsic evidence of the
> contracting parties' intent.  If resort to
> such extrinsic evidence does not resolve the
> ambiguity, then [the court] proceed[s] to a
> third and final step, namely, resort to
> appropriate maxims of construction.

*McKay's Mkt. of Coos Bay, Inc. v. Pickett*, 212 Or. App. 7, 12

(2007)(internal quotations and citations omitted).  *See also*

*Tipperman v. Tsiatsos*, 327 Or. 539, 545-46 (1998).

When construing an agreement, the court's duty is

"to ascertain and declare what is, in terms or in substance,

contained therein, not to insert what has been omitted, or to

omit what has been inserted; and where there are several

provisions or particulars, such construction is, if possible, to

be adopted as will give effect to all."  Or. Rev. Stat. § 42.230.

In addition, "[i]n the construction of an instrument the

intention of the parties is to be pursued if possible; and when a

general and particular provision are inconsistent, the latter is

paramount to the former.  So a particular intent shall control a

general one that is inconsistent with it."  Or. Rev. Stat.

§ 42.240.

15 - OPINION AND ORDER

    **2.    Enjoined products under the Consent Judgment and Permanent Injunction are not limited to products manufactured by Defendant.**

    As noted, the Consent Judgment and Permanent Injunction provides in pertinent part:

> [Defendant is] permanently enjoined from . . . contributing to the infringement of . . . any of the claims of U.S. Patent No. 6,799,994 by (I) making, using, selling, [or] offering for sale . . . any Infringing Products that were the subject of this action or any product that is not more than colorably different therefrom regardless of the trade name, model number, or other product designation under which any such product is made, used, sold, or offered for sale . . . (collectively, the "Enjoined Products"); or (ii) selling, offering for sale or delivering any component parts (Smart Cables, reels or retractors, pucks or posts) for use in combination with or as part of any Enjoined Product.

Compl., Ex. B at ¶ 6.

    Defendant asserts under the terms of ¶ 6, an "enjoined product" is only meant to be a product that Defendant makes, sells, uses, or offers for sale and does not include products made by Diam. Defendant contends this interpretation arises from the phrase "not more than colorably different" and from the parties' negotiations surrounding settlement. Defendant noted at oral argument that the phrase "not more than colorably different" is a "well understood . . . well traveled road in the context of patent law and patent cases." Defendant noted in patent cases generally and in the *KSM Fastening Systems* and

16 - OPINION AND ORDER

*Additive Controls* cases in particular, that phrase was used in the context of a new product made by the accused infringer. Defendant's counsel emphasized they have "not seen a single case where there's been a discussion of not more than colorably different in the context of a product made by a third party."

The Court does not find Defendant's argument persuasive. Paragraph 6 of the Consent Judgment and Permanent Injunction specifically provides an enjoined product is "any product" that is not more than colorably different from the infringing product "regardless of the trade name, model number, or other product designation under which any such product is made, used, sold, or offered for sale." The language of ¶ 6 is clear and unambiguous: It does not limit enjoined products to only those made, used, sold, or offered for sale by Defendant. In addition, as the Court noted at oral argument, the Court is not considering the generic interpretation of the phrase "not more than colorably different" in a vacuum. The parties have been litigating the issues surrounding the '994 Patent in this Court for at least six years in three different actions, and, therefore, ordinary or basic standards related to the phrase "not more than colorably different" are not particularly helpful. In any event, the plain language of ¶ 6 does not suggest enjoined products are limited as Defendant proposed.

Defendant also relies on the parties' negotiations

17 - OPINION AND ORDER

leading to the Settlement Agreement and the Consent Judgment and Permanent Injunction to support its contention that ¶ 6 applies only to products made, sold, used, or offered for sale by Defendant.  Assuming without deciding that the Court may examine parole evidence to determine the meaning of ¶ 6, the Court notes the record reflects that in negotiating the settlement Plaintiffs specifically rejected Defendant's suggestion that ¶ 6 be limited only to the products that the Court found to be infringing in *Vanguard II*.  In a series of emails exchanged between the parties' counsel before concluding the settlement, Defendant proposed:

> [Defendant] agrees not to manufacture, use, sell, offer for sale . . . (a) the products found in the Litigation to infringe pursuant to Amended Opinion and Order [docket #245] dated January 16, 2009 (collectively the Infringing Products); or (b) component parts of Infringing Products, including Smart Cables, reels or retractors, pucks and posts; or (c) any modification thereof.

Decl. of Thane Allison, Ex. 3 at ¶ 2.1.  Plaintiffs, however, rejected the proposed language, and, as noted, the parties agreed to the language set out above, which prohibits Defendant from selling, making, or offering for sale "any Infringing Products . . . or any product that is not more than colorably different therefrom regardless of the trade name, model number, or other product designation under which any such product is made, used, sold, or offered for sale."  Thus, even considering the language

18 - OPINION AND ORDER

of the Consent Judgment and Permanent Injunction in light of
these negotiations, the Court concludes it does not limit
enjoined products to those made, used, sold, or offered for sale
by Defendant.

### 3.    Defendant's assertion of an implied license.

Defendant asserts even if enjoined products are
not limited to those made, used, sold, or offered for sale by
Defendant, Plaintiff cannot establish Defendant contributed to
infringement of the '994 Patent by Wal-Mart because Wal-Mart had
an implied license to continue to use Diam's products (including
Defendant's Smart Cable) due to a settlement agreement between
Diam and Plaintiffs.

Plaintiffs assert they are not required to prove
"actual, legal, induced infringement" (*e.g.,* to establish that
Wal-Mart did not have a license to use the Diam product) because
the Consent Judgment and Permanent Injunction clearly defines the
conduct that constitutes infringement.  Plaintiffs also point out
the settlement agreement between Plaintiffs and Diam specifically
provides that it does not create any implied or actual licenses.

### a.    Plaintiffs need not prove "actual, legal, induced infringement."

The Patent Act provides in pertinent part
that courts "may grant injunctions in accordance with the
principles of equity to prevent the violation of any right
secured by a patent, on such terms as the court deems

19 - OPINION AND ORDER

reasonable."   25 U.S.C. § 283.   The core "right secured by a

patent" is "the right to exclude others from making, using,

offering for sale, or selling the invention throughout the United

States."   35 U.S.C. § 154(a)(1).

       To support its assertion that Plaintiffs

cannot establish Defendant contributed to infringement of the

'994 Patent by Wal-Mart because Wal-Mart had an implied license

to continue to use Diam's products (including Defendant's Smart

Cable) due to the settlement agreement between Diam and

Plaintiffs that did not specifically prohibit sales of Diam's

infringing products to Wal-Mart, Defendant relies on *Johns

Hopkins University v. CellPro, Incorporated*, in which the court

noted:

>                Section 283 of the Patent Code empowers the
>        courts to "grant injunctions in accordance
>        with the principles of equity to prevent the
>        violation of any right secured by patent, on
>        such terms as the court deems reasonable."
>        35 U.S.C. § 283 (1994).   In accordance with
>        the clear wording of this section, "an
>        injunction is only proper to the extent it is
>        'to prevent the violation of any right
>        secured by patent.'"   *Eli Lilly & Co. v.
>        Medtronic, Inc.*, 915 F.2d 670, 674, 16 USPQ2d
>        2020, 2024 (Fed. Cir. 1990)(quoting 35 U.S.C.
>        § 283).   A "necessary predicate" for the
>        issuance of a permanent injunction is
>        therefore a determination of infringement.
>        *Id.* . . .   [J]udicial restraint of lawful
>        noninfringing activities must be avoided.

152 F.3d 1342, 1365-66 (Fed. Cir. 1998)(citations omitted).   *See

also Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302,

20 - OPINION AND ORDER

1311 (Fed. Cir. 2002)("[A]n injunction cannot impose unnecessary restraints on lawful activity.").  To establish that Defendant breached the Consent Judgment and Permanent Injunction and Settlement Agreement, Defendant asserts Plaintiffs must first show Defendant contributed to actual infringement of the '994 Patent.  In particular, Defendant asserts Plaintiffs must show Wal-Mart did not have an implied license to use Diam's products. Defendant maintains if Wal-Mart had an implied license, the Consent Judgment and Permanent Injunction would "restrain" Defendant's lawful, noninfringing activities in violation of the Patent Act.

As Plaintiffs note, however, neither *Johns Hopkins* nor *Riles* involved a contempt proceeding following a settlement agreement between the parties.  Plaintiffs point to the Federal Circuit's following statement in *Arbek Mfg., Inc. v. Moazzam*, a case that actually involved contempt proceedings: "[T]o show contempt, the patent owner [only] must prove by clear and convincing evidence that 'the modified device falls within the admitted or adjudicated scope of the claims and is, therefore, an infringement.'"  55 F.3d 1567, 1569 (Fed. Cir. 1995)(quoting *KSM Fastening Sys.*, 776 F.3d at 1530).  As Plaintiffs point out, the Federal Circuit in *Arbek* and *KSM Fastening Systems* did not conclude a party bringing a contempt motion must rebut every possible defense to infringement.

21 - OPINION AND ORDER

In any event, the Court notes the Consent Judgment and Permanent Injunction specifically defines the conduct prohibited by the injunction as "actively inducing the infringement of any of the claims of [the '994 Patent] by selling, offering for sale, or delivering any component parts . . . for use in combination with or as any part of any Enjoined Product." When they executed the Settlement Agreement and the Consent Judgment and Permanent Injunction, the parties defined the conduct that constituted "inducing infringement," and both parties are entitled to the benefit of their bargain. The Court notes the parties did not include any agreement that Defendant could rely on defenses to infringement such as the existence of an implied license. Thus, the Court concludes Defendant may not now seek to prove that it did not induce infringement based on defenses available outside of the context of the Settlement Agreement and the Consent Judgment and Permanent Injunction.

> **b.    Even if Defendant could raise general defenses to infringement, Defendant has not established Wal-Mart had an implied license.**

Plaintiffs assert even if Defendant was permitted to raise general defenses to infringement, Defendant has not established Wal-Mart had an implied license to continue to sell Diam's products, including Defendant's Smart Cable. The settlement agreement between Diam and Plaintiffs specifically provides:

22 - OPINION AND ORDER

> No Patent Licenses.  No terms in this
> [Settlement] Agreement shall be construed to
> convey a patent license, express or implied,
> to the other party.  That is, [Diam] has not
> become a licensee on any Vanguard patent, nor
> has Vanguard become a licensee on any [Diam]
> patent.

Decl. of Timothy S. DeJong, Ex 26 at ¶ 24.  The language of that settlement agreement is clear and unambiguous.  The Court, therefore, concludes Defendant has not established Wal-Mart had an implied license to continue to sell Diam's products,[4] and, therefore, Defendant has not established it is entitled to assert Wal-Mart had an implied license as a defense against Plaintiffs' claim that Defendant contributed to infringement under the Consent Judgment and Permanent Injunction.

In summary, because Plaintiffs need not rebut a defense such as an implied license in order to establish contempt generally (*see Arbek* and *KSM Fastening Systems*) and because the Court has found Defendant contributed to infringement as that term is defined in the Consent Judgment and Permanent Injunction, the Court concludes Plaintiffs have established there are not any substantial open issues as to whether Defendant contributed to infringement of the '994 Patent.  The Court, therefore, concludes Plaintiffs have shown by clear and convincing evidence that Defendant is in contempt for violating the terms of the Consent

---

[4] The Court specifically limits its conclusion to the circumstances of this case and does not rule as to any implied license held by Wal-Mart outside of the context of this action.

23 - OPINION AND ORDER

Judgment and Permanent Injunction by continuing to sell its Smart Cables to Wal-Mart for use in the Diam products that infringe Plaintiffs' patent.

**III. Defendant violated the Settlement Agreement by selling Infringing Products for new-store openings without existing customer commitments.**

The Settlement Agreement provides in pertinent part:

> 4.1  To facilitate MTI's transition from the Infringing Products to new products, Telefonix and Vanguard agree that MTI may utilize the following parts associated with Infringing Products:  Smart Cables, retractors, pucks and posts (collectively "Transition and Service Periods"), limited as follows:
>
> a.  For existing customer commitments for new store openings and retrofits during the time period from May 11, 2009, through December 31, 2009 (the "Transition Period").

Compl., Ex. B at ¶ 4.1.

**A.  Background related to new-store openings (NSO) claim.**

Shortly before the end of the transition period Plaintiffs employed an auditor to audit Defendant's compliance with the Consent Judgment and Permanent Injunction; specifically, Defendant's compliance with Defendant's NSO transactions.  Decl. of Jay Sickler at ¶ 2.  The auditor requested from Defendant a listing of NSOs and associated transition payments.  Ultimately Defendant provided the auditor with a spreadsheet that, according to Defendant, contained information for all NSOs for which Defendant made transition payments pursuant to the Settlement Agreement.  Sickler Decl. at ¶ 4.  The auditor then selected at

24 - OPINION AND ORDER

random 20 of the 282 identified transactions for audit testing.
To test the 20 transactions, the auditor requested Defendant to
provide documentation of its existing customer commitments for
each of those transactions, including records reflecting when the
orders were placed. Sickler Decl. at ¶ 5. After examining
Defendant's documentation, the auditor determined Defendant's
"purchase orders or quotes to their customers for 14 of the 20
transactions were placed after May 11, 2009. For those 14
transactions, [Defendant] produced no record of a commitment
existing as of May 11, 2009." Sickler Decl. at ¶ 5. The auditor
informed Plaintiffs of the results of the audit.

**B. Parties' positions.**

Plaintiffs assert Defendant violated ¶ 4.1(a) of the
Settlement Agreement when Defendant made sales of Smart Cables to
Best Buy, T-Mobile, Jones Lang LaSalle, Hamilton Fixture, Meijer,
Electricidad, Ideas2Go, Unicam, SPOS, and Wal-Mart without an
existing customer commitment for NSOs during the transition
period of May 11, 2009, to December 31, 2009.[5]

Defendant does not deny it made sales of Infringing
Products to Best Buy, T-Mobile, Jones Lang LaSalle, Hamilton
Fixture, Meijer, Electricidad, Ideas2Go, Unicam, SPOS, and Wal-
Mart during the transition period and acknowledges it does not

---

[5] The parties advised the Court at the November 19, 2010,
hearing that Defendant ceased sales of Smart Cables to all
customers on December 31, 2009.

have purchase orders with dates prior to May 11, 2009, for all of those sales.  Defendant, however, maintains "existing customer commitments" under the Settlement Agreement are not limited to sales pursuant to purchase orders dated before the Settlement Agreement because that phrase as it is used in the industry also includes "moral or ethical obligation[s]."  Defendant asserts it had an existing customer commitment in the broader sense of the word for every sale of infringing products for NSOs made in the transition period.  Defendant contends if Plaintiffs intended to restrict the meaning of "existing customer commitments" in the Settlement Agreement, Plaintiffs could have used the term "existing customer contractual obligation" or "existing customer orders."

### C.  Standards.

As noted, the Settlement Agreement provides its "construction, [and] interpretation . . . shall be governed by the laws of the State of Oregon."  Compl., Ex. B at ¶ 18.  Thus, the Court again applies Oregon rules of construction to the Settlement Agreement.

### D.  Construction of the term "existing customer commitment."

The Settlement Agreement does not define the term "existing customer commitment."  The Court concludes the term "existing customer commitment" is sufficiently ambiguous on its face as to be subject to more than one plausible and reasonable

26 - OPINION AND ORDER

meaning.  The parties do not suggest the Court could ascertain the meaning of the term most likely intended by the parties by evaluating the term in the context of the instrument as a whole. Thus, the Court examines extrinsic evidence in an effort to ascertain the meaning of the term most likely intended by the parties when they entered into the Settlement Agreement.

As noted, Plaintiffs contend the term means only those customer commitments for which Defendant had purchase orders or written contractual agreements for NSOs as of May 11, 2009. Defendant, in turn, argues the meaning of the term is much broader within the industry.  Defendant relies on the Declarations of Mike Cook, Thane Allison, and Hunter Wylie to show the term "existing customer commitments" has a broader meaning in Defendant's industry than merely referring to commitments via purchase orders received.

Mike Cook, Defendant's Chief Executive Officer, testifies in his Declaration that in Defendant's industry retailers plan NSOs for a year or more in advance of the actual opening date.  As part of the process of preparing for an NSO, retailers generally engage in a bidding process for suppliers, designate a supplier, and incorporate the supplier's product specifications into the new store design.  Cook testifies Defendant's "existing customers" usually provide Defendant with estimates of the number of NSOs so Defendant can provide a "price

quote."  If Defendant is chosen as the supplier, the retailer

provides Defendant with a Supplier Tracking Report (STR).

Defendant then commits to supply the stores on the STR with

Defendant's products "as of the date of the list."  Cook notes a

purchase order specifying a particular delivery date and location

for the delivery is

> not issued until shortly before the shipping date
> . . . .  However, in order to fill the order by
> the date in the purchase order, [Defendant] needed
> the months of lead time provided in the STR . . .
> to acquire the materials, to assemble the parts
> and to build the 'kit' for each store. . . .
> Delivery dates specified in the purchase orders
> are generally just a few weeks before the store
> opening and just before the units were scheduled
> for installation, so the retailer would not have
> to warehouse the parts or pay before using.

Decl. of Mike Cook ¶ 7.

Hunter Wylie, Defendant's Vice President of Operations,

testifies in his Declaration that Defendant has "established

business relationships with a number of retailers" who Defendant

refers to as "existing customers."  Decl. of Hunter Wylie at ¶ 2.

Wylie explains Defendant defines "existing customers" as

retailers with whom Defendant "had previously negotiated and

agreed to prices, product lists, credit terms, delivery terms,

payment terms and/or warranties . . . so that if the customer

places an order [Defendant] will honor that order."  Wylie Decl.

at ¶ 2.  Wylie notes when Defendant "is designated as the

supplier to an existing customer," presumably after the bid

28 - OPINION AND ORDER

process set out in Cook's Declaration, "the customer relies on [Defendant] to supply its needs for [NSOs], remodels and merchandise changes." Wylie Decl. at ¶ 3. Wylie further notes it is customary in Defendant's industry that even if a customer changes suppliers, Defendant "will continue to supply that customer during the transition period in order to make the transition as smooth as possible." Wylie Decl. at ¶ 6.

Thaine Allison, Defendant's Vice President of Products and Systems, testifies in his Declaration that he agrees with Cook and Wylie's descriptions of the customs and practices of Defendant's industry. Although Plaintiffs do not point to any contrary evidence, Plaintiffs label Defendant's contention that the term "existing customer commitments" is broad enough to encompass Defendant's "moral" or "ethical" obligation to provide goods as "absurd." Plaintiffs argue such an interpretation would "render the restriction meaningless and unenforceable."

On this record, the Court does not find any basis to conclude the term "existing customer commitment" should be interpreted so broadly that it encompasses any undefined or self-imposed moral or ethical obligation to provide goods to which Defendant now points. The Court agrees with Plaintiffs that such a broad interpretation would render the term essentially meaningless and unenforceable.

Nevertheless, the Court concludes Defendant has

29 - OPINION AND ORDER

established the term encompasses more than only those commitments contained in purchase orders received.  Based on the uncontradicted Declarations of Cook and Wylie, the Court concludes the term "existing customer commitments" as used in Defendant's industry and, therefore, as intended in the Settlement Agreement, refers to commitments in the relevant time period to customers who accepted bids by Defendant that included specific goods to be provided, a price for those goods, and a delivery date through an STR or similar document.  So long as a customer accepted and agreed to Defendant's bid within the relevant time period, Defendant had an existing obligation to provide the goods as described on the specified date and, therefore, had an existing commitment to that customer within the meaning of the Settlement Agreement.

### E.   Analysis.

Plaintiffs assert even if the Court concludes the term "existing customer commitment" has a broader meaning than only those commitments to customers evidenced by purchase orders received, Defendant has not established it had existing customer commitments for NSOs or retrofits with Best Buy, T-Mobile, Jones Lang LaSalle, Hamilton Fixture, Meijer, Electricidad, Ideas2Go, Unicam, SPOS, and Wal-Mart to whom Defendant sold infringing products during the transition period.

        1.    **Sales to Best Buy.**

        According to Plaintiffs, Defendants made several sales of infringing products to Best Buy within the transition period without an existing customer commitment as of May 11, 2009.  Specifically, Plaintiffs note sales of infringing products made by Defendant to Best Buy for NSOs for Store Nos. 1771, 1172, 1397, 1537, 1539, and 1535.

        Defendant points to a Displays Procurement Agreement (DPA) dated April 10, 2006, to establish it had an existing customer commitment to provide Best Buy with the infringing products as of May 11, 2009.  Plaintiffs, nevertheless, contend the DPA does not establish any existing customer commitment for the infringing products.  Plaintiffs note ¶ 2(A) of the DPA provides:  "Except as otherwise stated herein, purchase orders will be limited to the Products, prices, and any special terms and conditions listed in Exhibit A."  DeJong Decl., Ex. 6 at 1.  It is undisputed that Exhibit A to the DPA does not include the infringing products, but instead references a different product line made by Defendant.  DeJong Decl., Ex. 6 at 13.  The DPA further provides Exhibit A is applicable to "all Purchase Orders . . . during the first year after the Effective Date.  For any Purchase Orders thereafter, the parties agree to negotiate . . . a new Exhibit A."  DeJong Decl., Ex. 6 at 1.  The record reflects Defendant and Best Buy renegotiated and amended

Exhibit A on October 31, 2006, but the amendment did not include the infringing products. DeJong Decl., Ex. 7 at 1. Defendant does not point to any other renegotiated or amended Exhibit A in the record that reflects inclusion of the infringing products.

In addition, Plaintiffs assert the DPA on its face is an agreement by Defendant to charge specific prices for specific products *only if* Best Buy decides to order any of those products and Defendant decides to accept the order, and, therefore, it does not reflect an actual commitment by Best Buy to purchase anything or by Defendant to sell anything. To support their assertion, Plaintiffs rely on ¶ 2(c) of the DPA, which provides in pertinent part:

> Unless otherwise expressly agreed to in writing by the parties, Purchaser shall have no obligation or liability to purchase all or any particular volume of any type of Products from Seller. Purchaser does not guarantee, and is not obligated to issue, any particular number or type of purchase orders with Seller.

DeJong Decl., Ex. 6 at 3.

The Court agrees the DPA does not establish an existing customer commitment before May 11, 2009, to provide the infringing products referenced in the Settlement Agreement. Although Defendant points to its product and price lists for 2009 provided to Best Buy before January 16, 2009, to support its position, there is not any indication that Defendant and Best Buy intended these lists to constitute amendments to Exhibit A to the

32 - OPINION AND ORDER

DPA.

Defendant also relies on an STR provided to Defendant by Best Buy on May 5, 2009, that lists NSOs for Store No. 1771 in Pennsylvania and Store No. 1172 in New York. As Cook noted in his Declaration, after a retailer accepts Defendant's bid and provides Defendant with an STR, Defendant is obligated to provide the retailer with the products. The Court agrees.

The Court, therefore, concludes on this record that Defendant has established an existing customer commitment to Best Buy as to its NSOs for Store Nos. 1771 and 1172. The Court finds, however, Defendant has not identified any evidence in the record to establish that Defendant had an existing customer commitment to make sales of infringing products to Best Buy's other stores as of May 11, 2009. Accordingly, the Court concludes Plaintiffs have established Defendant violated the Settlement Agreement when it sold infringing products to Best Buy for NSOs in Store Nos. 1397, 1537, 1539, and 1535 without an existing customer commitment.

**2.  Sales to T-Mobile, Jones Lang LaSalle, and Hamilton Fixture.**

Plaintiffs assert Defendants made sales of infringing products to T-Mobile, Jones Lang LaSalle, and Hamilton Fixture during the transition period without an existing customer commitment.

The record reflects Defendant and T-Mobile entered

33 - OPINION AND ORDER

into a Master Agreement for Services (MAS) on June 26, 2008,
which specified it would remain in effect for two years unless
Defendant and T-Mobile "execut[ed] an agreement extend[ing] the
Term before the expiration of the Term." DeJong Decl., Ex. 12 at
5. On February 18, 2009, Defendant and T-Mobile executed
Amendment No. 1 to the MAS, which specified the MAS "expired on
June 25, 2008 pursuant to the terms of the [MAS]." Plaintiffs
note Amendment 1 further provided that T-Mobile "wishes to hire
[Defendant] to supply specific Products and to deliver specific
Deliverables as outlined in this [Statement of Work] SOW."
DeJong Decl., Ex. 12 at 30. Defendant agreed to provide T-Mobile
with a number of noninfringing products, but the SOW did not
include any infringing products. According to Plaintiffs,
therefore, Defendant has not established it had an existing
customer commitment to provide T-Mobile with infringing products
before May 11, 2009.

Defendant, however, emphasizes Amendment 1 also
provided Defendant and T-Mobile

> [a]cknowledge that the [MAS] has expired.
> However, [Defendant and T-Mobile] agree to
> amend the [MAS] to extend the Term of the
> [MAS] only for purposes of this SOW until it
> is superseded by te term and conditions of a
> new Master Purchase Agreement. . . .
> [Defendant and T-Mobile] further agree that
> the terms and conditions of the [MAS] are
> incorporated into this SOW and shall govern
> this SOW and shall be effective so long as
> this SOW is in effect.

Dejong Decl., Ex. 12 at 32.  Amendment 1 provided it would
"conclude on August 17, 2009."  Dejong Decl., Ex. 12 at 32.
According to Defendants, therefore, Amendment 1, which Defendant
and T-Mobile entered into before May 11, 2009, incorporated the
terms and conditions of the MAS to include that Defendant would
provide the infringing products through August 17, 2009.
Defendant also points out that on July 28, 2009, Defendant and T-
Mobile entered into Amendment 2 to the MAS effective as of
August 18, 2009, in which Defendant agreed to provide a number of
its products to T-Mobile, some of which were infringing products.
Finally, Defendant points to a Master Supplier Tracking Report
(MSTR) provided to Defendant by T-Mobile on May 12, 2009, that
set out Defendant's commitment to supply T-Mobile stores as it
existed at the time of the Settlement Agreement.  Defendant,
therefore, asserts it had an existing customer commitment within
the meaning of the Settlement Agreement to provide T-Mobile with
the infringing products during the transition period.  Thus,
Defendant's sales of infringing products to T-Mobile did not
violate the Settlement Agreement.

        The Court agrees.  Moreover, because the record
also reflects T-Mobile appointed Jones Lang LaSalle to administer
T-Mobile's "existing [MAS] with T-Mobile" as of August 1, 2009,
Allison Decl., Ex. 1017 at 1, the Court concludes Defendant has
established its sales of infringing products to Jones Lang

35 - OPINION AND ORDER

LaSalle were covered by and included in the agreement between
Defendant and T-Mobile and did not violate the Settlement
Agreement.

Defendant asserts Hamilton Fixture was a
"distribution agent of T-Mobile . . . [authorized] to operate a
warehouse that supplies parts to independent store owners and
franchisees. As such, [Defendant] supplies the parts to Hamilton
Fixture under the terms of the MAS." Allison Decl. at ¶ 18.
Defendant, however, does not point to any evidence in the record
to support its assertion that Hamilton Fixture is an authorized
agent of T-Mobile or that it made sales to Hamilton Fixture under
the terms of the MAS. The record contains only purchase orders
from Hamilton Fixture after the Settlement Agreement was
executed. The purchase orders contain the notation "Vendor 11744
Merchandising Tech., Inc.," but there is not any agreement in the
record between Defendant and T-Mobile or Defendant and Hamilton
Fixture suggesting these sales were made pursuant to the MAS.
The Court concludes Defendant has not shown its sales of
infringing products to Hamilton Fixture were covered by or
included in the agreement between Defendant and T-Mobile, and,
therefore, Defendant has not established it had an existing
customer commitment with Hamilton Fixture as of May 11, 2009.

In summary, the Court concludes Defendant has
established it had an existing customer commitment with T-Mobile

and Jones Lang LaSalle to supply products, including infringing products, at the time the parties entered into the Settlement Agreement on May 11, 2009, and, therefore, these sales constituted existing customer commitments and did not violate the Settlement Agreement. Defendant, however, has not established its sales to Hamilton Fixture were within the MAS, and, therefore, the Court concludes Defendant's sales of infringing products to Hamilton Fixture violated the Settlement Agreement.

### 3.    Sales to Meijer.

Plaintiffs assert Defendant has not established it had an existing customer commitment for its sales of infringing products to Meijer after May 11, 2009.

Defendant contends it entered into a commitment with Meijer in mid-2008 to provide a "remodel package for all of their stores." Allison Decl. at ¶ 19. Defendant, however, did not submit any documentary evidence confirming a commitment or agreement with Meijer. To support its assertion that it had such an agreement, Defendant points to a June 10, 2008, quote from Defendant to Meijer for "MTI Part Number - PF-4154." Allison Decl., Ex. 1018. Defendant also relies on a spreadsheet that it contends is a "history of the orders" by Meijer with dates ranging from June 28, 2008, through May 13, 2009. Allison Decl., Ex. 1019. Finally, Defendant refers to a number of other documents, including a packing slip dated June 3, 2009; an

37 - OPINION AND ORDER

undated spreadsheet labeled "Spring and Fall transition times for 2009"; and a history of Defendant's "Bill of Materials" with dates from October 29, 2009, through July 9, 2010.  Allison Decl., Exs. 1020-22.  The Court concludes this evidence establishes only that Defendant had a series of transactions with Meijer in which Defendant provided products to Meijer from June 2008 through July 2010, but the evidence does not show a binding, existing customer commitment to provide Meijer with infringing products was in place before May 11, 2009.

Accordingly, the Court concludes Plaintiffs have established Defendant's sales of infringing goods to Meijer noted in Exhibits 16 and 17 to the Declaration of Timothy DeJong violated the Settlement Agreement.

**4.    Sales to Electricidad.**

Plaintiffs assert Defendant has not established it had an existing customer commitment for its sales of infringing products to Electricidad after May 11, 2009.

The record reflects on April 1, 2009, Defendant and Electricidad entered into a Distribution Agreement (DA) in which Defendant appointed Electricidad as its distributor to buy products, including infringing products, from Defendant at specific prices and to distribute those products in Panama. DeJong Decl., Ex. 18 at 1.  As Plaintiffs note, the DA did not involve any NSOs or retrofits, and, therefore, it does not

38 - OPINION AND ORDER

constitute evidence of any "existing customer commitment[] for new store openings [or] retrofits."

Defendant appears to concede the agreement with and sales to Electricidad did not involve NSOs.  Defendant, however, asserts it "worked with Electricidad and developed a quotation . . . dated May 13, 2009. . . .  That sale was in the works on May 11, 2009."  Allison Decl. at ¶ 22.  The Court concludes a sale that is merely "in the works" on May 11, 2009, is insufficient to establish an existing customer commitment for NSOs within the meaning of that term in the Settlement Agreement.

Defendant also points to its Bills of Material for the purchase orders pertaining to two of the three sales to Electricidad that Plaintiffs allege violated the Settlement Agreement and notes the Bills of Material show these sales did not include any infringing products.  The Court agrees.

In summary, the Court concludes Defendant has not established it had an existing customer commitment for NSOs or retrofits with Electricidad as of May 11, 2009, and, therefore, the sale of infringing products by Defendant to Electricidad noted in Exhibit 19 at 1 to the Declaration of Timothy DeJong violated the Settlement Agreement.

### 5.  **Sales to Ideas2go.**

Plaintiffs contend Defendant has not established it had an existing customer commitment for NSOs for sales of

infringing products to Ideas2go after May 11, 2009.

The record reflects Defendant and Ideas2go entered into a DA effective November 19, 2008, in which Defendant appointed Ideas2go as its distributor to buy products, including infringing products, from Defendant at specific prices and to distribute those products in Brazil. DeJong Decl., Ex. 20 at 1, 10. As with the DA between Defendant and Electricidad, the DA between Defendant and Ideas2go did not involve any NSOs or retrofits. Even though the record may reflect Defendant had an existing customer commitment with Ideas2go before May 11, 2009, it does not reflect Defendant had such a commitment "for new store openings [or] retrofits."

Accordingly, the Court concludes on this record that Defendant has not established it had an existing customer commitment for NSOs or retrofits with Ideas2go as of May 11, 2009, and, therefore, the sales of infringing products by Defendant to Ideas2go noted in Exhibit 21 to the Declaration of Timothy DeJong violated the Settlement Agreement.

**6.  Sales to Unicam.**

Plaintiffs assert Defendant has not established it had an existing customer commitment for NSOs for its sales of infringing products to Unicam as of May 11, 2009.

The record reflects Defendant and Unicam entered into a DA. DeJong Decl., Ex. 22. Although the DA provides it is

40 - OPINION AND ORDER

effective as of January 1, 2009, Defendant did not sign the DA until May 20, 2009, and Unicam did not sign the DA until June 3, 2009. DeJong Decl., Ex. 22 at 8. Defendant, therefore, has not established it had an existing customer commitment as of May 11, 2009. In addition, the DA with Unicam did not involve NSOs or retrofits.

Accordingly, the Court concludes Defendant has not established it had an existing customer commitment for NSOs or retrofits with Unicam as of May 11, 2009, and, therefore, the sales of infringing products by Defendant to Unicam noted in Exhibit 23 to the Declaration of Timothy DeJong violated the Settlement Agreement.

**7.    Sales to Sydney Point of Sales (SPOS).**

Plaintiffs assert Defendant has not established it had an existing customer commitment for NSOs or retrofits for its sales of infringing products to SPOS as of May 11, 2009.

In December 2009 Defendant and SPOS signed a DA purportedly retroactive to August 13, 2009, in which Defendant appointed SPOS as its distributor to buy products, including infringing products, from Defendant at specific prices and to distribute those products in Australia and New Zealand. DeJong Decl., Ex. 24 at 1, 10. Although the DA does not reflect Defendant had an existing customer commitment for NSOs or retrofits with SPOS as of May 11, 2009, Defendant points to a

41 - OPINION AND ORDER

series of emails between Defendant and SPOS from March 12, 2009, through April 28, 2009, regarding an order placed by SPOS on April 24, 2009.  Allison Decl., Ex. 1025.  These emails, however, do not establish Defendant had an existing customer commitment with SPOS for orders for NSOs or retrofits.

Accordingly, the Court concludes Defendant has not established it had an existing customer commitment for NSOs or retrofits with SPOS as of May 11, 2009, and, therefore, the sales of infringing products by Defendant to SPOS noted in Exhibit 25 to the Declaration of Timothy DeJong violated the Settlement Agreement.

**8.   Sales to Wal-Mart.**

Plaintiffs assert Defendant did not have any existing customer commitment with Wal-Mart for NSOs as of May 11, 2009,[6] even though Defendant made nine sales of infringing products to Wal-Mart during the transition period in violation of the Settlement Agreement.  To support their assertion, Plaintiffs rely on emails between Defendant and Wal-Mart in June 2009.  On June 10, 2009, Defendant sent an email to Wal-Mart in which Defendant stated in pertinent part:

> [Defendant] has worked hard to build a solid
> relationship with Wal-Mart over the past
> years.  Yet we understand that the struggles

---

[6]   Plaintiffs note this issue is separate and apart from the issue of Defendant's sales of Smart Cables to Wal-Mart for use with Diam products.

42 - OPINION AND ORDER

experienced since our retractor challenges
earlier last year have compromised this
important relationship.

                        * * *

As we discussed at the end of our meeting on
Monday, we now must earn back your trust in
our ability to meet your performance
expectations.  We were there once . . . I
commit that we will be there again soon.  Now
that we have reached a settlement in our
legal dispute . . . and are able to continue
to support your NSO . . . with our current
platform, *we are hopeful you will consider
inserting us back into your NSO schedule*.  We
feel this is very important for a couple
reasons . . . first, it will allow us to
continue to support the workload for the
dedicated team we have built for serving
exclusively Wal-Mart . . . second it will
allow us the time to work with you to
transition to our new and improved products
in the months ahead . . . third, it will
provide you with a continued solid vendor
alternative moving forward.

DeJong Decl., Ex. 4 at 2-3 (emphasis added).  On June 25, 2009,

Defendant sent an email to Wal-Mart stating in pertinent part:

Is there an update regarding your planned
trip to check out our SmartTethers? . . .
Ideally, we would propose a side-by-side
comparison with one of your other approved
designs moving forward.  I have a growing
confidence that this test will make a
significant impact on Wal-Mart's view towards
the application of the SmartTether in your
stores.  *We desperately want to work our way
back into your store planning . . . and feel
this step is critical in demonstrating the
worthiness of this top priority*.

DeJong Decl., Ex. 4 at 1 (emphasis added).  On that same day Wal-

Mart responded as follows:

43 - OPINION AND ORDER

> When I have a chance to review your new
> system in action I will let you know.  As you
> know I have stressed we do not like the
> design and cumbersome nature of the way this
> new system has been installed.  Until you
> show us a new design we are not interested in
> the "Snorkel Version" as this point.

DeJong Decl., Ex. 4 at 1.

As to specific sales, Defendant contends the August 31, 2009, sale was a security system for fishing reels and did not include any infringing products.  DeJong Decl., Ex. 5 at 9.  In addition, Defendant points to an email exchange between Defendant and Wal-Mart that makes clear the items invoiced for the August 31, 2009, sale were never shipped, but instead were destroyed or salvaged.  Allison Decl., Exs. 1008, 1009.

The Court concludes Defendant has established the August 31, 2009, sale was not for infringing products and, in any event, was not actually consummated.  Accordingly, the Court concludes that sale did not violate the Settlement Agreement.

As to the sale on June 11, 2009, Defendant points to a Wal-Mart Schedule of Events Report dated December 2008, which is Wal-Mart's version of an STR and which sets out the forecasted expansion of the Wal-Mart in Chula Vista, California, and includes the purchase and use of Defendant's infringing product.  Allison Decl., Ex. 1014.  The Court concludes Defendant has established it had an existing customer commitment with Wal-Mart for the items shipped in Sales Order # SO-0078997 (DeJong

44 - OPINION AND ORDER

Decl., Ex. 5 at 3), and, therefore, this sale did not violate the Settlement Agreement.

As to the remaining seven sales to Wal-Mart that Plaintiffs allege violated the Settlement Agreement, Defendant generally asserts Wal-Mart has been a customer "for years" and remained Defendant's customer after the parties entered into the Settlement Agreement. In addition, Defendant points to Wal-Mart's General Project List (GPL), which is a forecast document equivalent to an STR prepared by Wal-Mart on February 25, 2009. Allison Decl., Ex. 1011. That document sets out each of the store orders for NSOs or remodels and includes forecast planning and requests for NSOs or remodel orders from Defendants for seven of the eight sales identified by Plaintiffs. The Court concludes Defendant has established the sales noted at pages 1-2 and 4-8 of Exhibit 5 to the DeJong Declaration did not violate the Settlement Agreement.

In summary, the Court concludes Defendant has established it had an existing customer commitment to Wal-Mart as of May 11, 2009, within the meaning of the Settlement Agreement for the NSOs set out in the Declaration of Timothy DeJong at Exhibit 5, and, therefore, those sales did not violate the Settlement Agreement.

F.  Contempt.

The Federal Circuit has held in order to "bring a

settlement agreement under [the contempt power of the district court], an order or judgment of the court must incorporate the settlement agreement such that a breach of the agreement also violates the court's decree." *Nat'l Presto Indus. Inc. v. Dazey Corp.*, 107 F.3d 1576, 1583 (Fed. Cir. 1997).  In *Vanguard II* this Court specifically incorporated the Settlement Agreement into the May 11, 2009, Consent Judgment and Permanent Injunction.  The Court, therefore, has the power, in the exercise of its discretion, to hold Defendant in contempt for violating the Settlement Agreement.

        As noted, the Court has concluded Plaintiffs have established by clear and convincing evidence that Defendant violated ¶ 4 of the Settlement Agreement when it (1) sold infringing products to Best Buy for Store Nos. 1397, 1537, 1539, and 1535; (2) sold infringing products to Hamilton Fixture; (3) sold infringing products to Meijer; (4) sold infringing products to Electricidad as noted in Exhibit 19 at 1 to the Declaration of Timothy DeJong; (5) sold infringing products to Ideas2go; (6) sold infringing products to Unicam; and (7) sold infringing products to SPOS.  The Court also concludes there are not any substantial open issues with respect to infringement to be tried as to these sales.  Accordingly, the Court finds Defendant is in contempt of the Consent Judgment and Permanent Injunction for making the above sales of infringing products

46 - OPINION AND ORDER

during the transition period.

**IV.  Further proceedings**

Plaintiffs contend if the Court finds Defendant to be in contempt, the Court should require Defendant to disgorge its profits as well as attorneys' fees to Plaintiffs as an appropriate remedy.  Defendant disagrees and contends under § 284 of the Patent Act, a patentee is entitled only to recover its damages rather than the infringer's profits.

At both oral arguments, the Court made clear it would require further proceedings to determine the appropriate type and amount of remedy if the Court found Defendant to be in contempt. Accordingly, the Court directs the parties to confer and jointly to propose no later than **April 8, 2011**, a plan and schedule for resolution of the remedy issues that the Court must determine to complete the adjudication of Plaintiff's Motion (#21) for Order to Show Cause Why Defendant Should Not be Held in Contempt.  The parties should also consider and address in their joint report their positions as to what issues remain to be litigated in this action after the Court determines the appropriate contempt remedy as well as a plan and schedule to conclude those as well.  After receiving the parties' joint recommendations, the Court will schedule a Rule 16 Conference to schedule necessary further proceedings.

47 – OPINION AND ORDER

## CONCLUSION

For these reasons, the Court **GRANTS** Plaintiffs' Motion (#21) for Order to Show Cause Why Defendant Should Not Be Held in Contempt and finds Defendant in contempt for violating the Consent Judgment and Permanent Injunction and Settlement Agreement as set out above.  The Court **DIRECTS** the parties to confer and jointly to propose no later than **April 8, 2011**, a plan and schedule for resolution of the remedy issues that the Court must determine to complete the adjudication of Plaintiff's Motion (#21) for Order to Show Cause Why Defendant Should Not be Held in Contempt.  The parties should also consider and address in their joint report their positions as to what issues remain to be litigated in this action after the Court determines the appropriate contempt remedy as well as a plan and schedule to conclude those as well.  After receiving the parties' joint recommendations, the Court will schedule a Rule 16 Conference to schedule necessary further proceedings.

IT IS SO ORDERED.

DATED this 24th day of March, 2011

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

48 - OPINION AND ORDER